**In re John L. SHANKWILER,
D.C., Debtor.**

**John L. SHANKWILER, D.C., Plaintiff,**

**v.**

**NATIONAL STUDENT LOAN MARKETING, California Student Aid Commission, Van Ru Credit Corp., Defendants.**

**Bankruptcy No. SB95–26351 MG.
Adversary No. SB96–1109 MG.**

United States Bankruptcy Court,
C.D. California,
San Bernardino Division.

April 30, 1997.

John L. Shankwiler, D.C., debtor in pro per.

Nora M. Manella, U.S. Atty., Leon W. Weidman, Chief, Civil Division, Tomson T. Ong, Asst. U.S. Atty., Los Angeles, CA, for National Student Loan Marketing.

Jeffrey J. Hagen, Hagen & Hagen, Encino, CA, for Van Ru Credit Corp.

Daniel E. Lungren, Sacramento, CA, for California Student Aid Commission.

## MEMORANDUM OPINION & ORDER

MITCHEL R. GOLDBERG, Bankruptcy Judge.

### INTRODUCTION

On November 21, 1995, John L. Shankwiler ("Debtor") filed a petition under Chapter 7 of the Bankruptcy Code, 11 U.S.C. § 101 et seq. On February 23, 1996 Debtor filed this adversary action against National Student Loan Marketing, et al., ("Defendants") to determine the dischargeability of his student loans.

The complaint identifies loans made by Defendants Student Loan Marketing Association[1] ("Sallie Mae"), California Student Aid Commission and Educational Resource Institute, Inc., real party in interest for defendant Van Ru Credit Corp. ("TERI"). Sallie Mae assigned the promissory notes for Debtor's Health Education Assistance Loan Marketing Association ("HEAL") to the Department of Health and Human Services. Debtor first incurred student loan debts in 1986. The HEAL loan currently due totals $39,090.20. The California Student Aid Commission loan currently totals $79,564.43. The TERI loan currently totals approximately $10,000. All Defendants interposed their Answer.

### FACTUAL BACKGROUND

Debtor is a thirty-eight year old male who received a Bachelor of Arts ("B.A.") degree, in history, from California Polytechnic University at Pomona in June 1982 and received a Doctor of Chiropractic Medicine ("D.C.") degree from an unaccredited chiropractic college known as Cleveland Chiropractic College ("CCC") in April 1990. At the time he completed his undergraduate studies, Debtor was employed in a management position at Radio Shack. He testified that he entered the field of chiropractic medicine to pursue a more lucrative career and to "get away from the seventy hour work week."

At the time of graduation from CCC, Debtor testified he was unemployed in the field of chiropractic medicine and returned to sales work at Radio Shack. Thereafter, in July, 1990 he obtained his license to practice chiropractic medicine in Texas. Debtor worked as a chiropractor in Texas from December 1990 until January 1992 earning approximately $2,000 a month gross. He left this employment for ethical/moral reasons (as he was allegedly expected to charge patients for unnecessary tests) and later obtained employment with another Texas company in January 1992. He remained in that position until October 1992 earning approximately $3,000 a month gross. That employer became insolvent and compensated Debtor for only six out of the ten months he worked.

Debtor further testified that by October 1992, Debtor was once again an unemployed chiropractor and moved back to California to reside with family. To practice chiropractic medicine, Debtor was required to become licensed in the state of California. At trial Debtor testified that it took two years for him to save the money required to obtain his California license, which he eventually obtained in April 1994.

Upon his return to California Debtor worked two jobs. In November 1992 Debtor became re-employed with Radio Shack and worked as a salesperson through March, 1995 earning minimum wage, plus commission. To further help make ends meet, Debtor began working as a lab assistant/instructor at CCC in May 1993 earning a net salary of $1,355.65 per month. His employment contract with CCC terminated in August 1996 and was not renewed. Debtor currently receives unemployment benefits of approximately $740.00 per month.

---

**1.** Student Loan Marketing Association is referenced in the complaint as National Student Loan Marketing Association.

Unable to meet his student loan obligations, Debtor obtained forbearance and paid only a small portion on each of the various loans. Debtor maintains that he cannot meet the loan requirements or expectations of these creditors. He testified that, although he has not abandoned a career in chiropractic medicine, he has been unable to find employment that would net $24,000.00 (the amount Debtor believes is necessary for him to live at a minimum standard while repaying his loans). Debtor's belief is based on his employment history following graduation from CCC and the trial testimony of Debtor's witness, Dr. Oliver Walker, a retired chiropractor.[2] Debtor has pursued fields outside chiropractic medicine, but has been unsuccessful in obtaining gainful employment.

Debtor testified at trial that he suffers no physical, emotional or psychological conditions which would prevent him from obtaining gainful employment. He further demonstrated that he is articulate and his positions at Radio Shack show that he has the ability to interface with the public. Debtor is single and has no dependents.

### DISCUSSION

The issue before this Court is whether the educational loans are dischargeable under 11 U.S.C. § 523(a)(8)(B). At an April 1996 hearing on a motion for summary judgment, this Court granted partial summary adjudication in favor of Department of Health and Human Services. This Court determined that Debtor's $39,090.20 HEAL loan was nondischargeable under 42 U.S.C. § 292f(g). As to all of the other loans, Debtor does not dispute the amounts outstanding, nor does he seek discharge of these loans pursuant to 11 U.S.C. § 523(a)(8)(A). Therefore, this discussion focuses on whether the remaining educational loans currently held by the California Student Aid Commission ($79,564.43) and TERI (approximately, $10,000) are dischargeable under 11 U.S.C. § 523(a)(8)(B).

### I. Section 523(a)(8)(B) and the Brunner Test

Bankruptcy Code, 11 U.S.C § 523(a)(8)(B) provides in pertinent part:

A discharge under section 727 ... does not discharge an individual debtor from any debt for an educational ... loan made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution, ... **unless excepting such debt from discharge under this paragraph will impose an undue hardship on the debtor and the debtor's dependents.** (Emphasis added.)

Bankruptcy courts have fashioned various tests for defining "undue hardship." *See e.g., Pennsylvania Higher Education Assistance Agency v. Faish (In re Faish),* 72 F.3d 298 (3rd Cir.1995) (considering three undue hardship tests: the *Brunner* test, *Brunner v. New York State Higher Education Services Corp.,* 831 F.2d 395 (2nd Cir.1987), the *Bryant* test, *Bryant v. Pennsylvania Higher Education Assistance Agency (In re Bryant),* 72 B.R. 913 (Bankr.E.D.Pa.1987), and the *Johnson* test, *Pennsylvania Higher Education Assistance Agency v. Johnson (In re Johnson),* 5 B.C.D. 532 (Bankr.E.D.Pa. 1979)), *cert. denied,* —— U.S. ——, 116 S.Ct. 2532, 135 L.Ed.2d 1055 (1996), and *Reh 'g denied,* —— U.S. ——, 117 S.Ct. 24, 135 L.Ed.2d 1118 (1996).[3] "The *Brunner* test

---

**2.** According to Dr. Walker's testimony, the field of chiropractic medicine has not been as lucrative since the late 1980's because HMO's and PPO's have reduced costs from 10% –30%.

**3.** Under the *Johnson* test, a court must ask (1) whether debtor's financial resources are sufficient to support debtor and to repay loan (mechanical test); (2) whether debtor was negligent or irresponsible in his efforts to minimize expenses, maximize resources or secure employment, and whether this negligence/irresponsibility altered the outcome of the mechanical test

(good faith test); and (3) what was debtor's dominant purpose for filing or whether debtor financially benefitted from the loan-financed education (policy test)? *Johnson,* 5 B.C.D. at 544.

Under the *Bryant* test, a court must analyze the income and resources of the debtor and his dependents in relation to the federal poverty guidelines. *Bryant,* 72 B.R. at 915. If debtor's income is substantially above the poverty guideline amounts, a discharge may result, but only if the debtor can establish the existence of "extraordinary circumstances." *Id.* If debtor's income is

has been adopted by a majority of the Courts of Appeals that have specifically addressed the issue of what single standard should be applied to determine whether 'undue hardship' exists under 11 U.S.C. § 523(a)(8)(B)." *Faish,* 72 F.3d at 303.

One recent bankruptcy decision, *Skaggs v. Great Lakes Higher Education Corp. (In re Skaggs),* 196 B.R. 865 (Bankr.W.D.Okla. 1996), rejected application of any court-fashioned undue hardship test and stated "when common words are used in statutes, principles of statutory construction require the words be given their common and ordinary accepted meaning." *Id.* at 867. In applying the common sense definition of "undue hardship," the *Skaggs* Court concluded that where a debtor lived in such a frugal manner with a monthly deficit of more than $150, "[i]f 'undue hardship' means anything under a common sense definition, repayment of the $47,000 student loan ... must be viewed as imposing an undue hardship." *Id.* at 868.

■ The Ninth Circuit has been silent as to which court-fashioned test applies (if any) for determining dischargeability under § 523(a)(8)(B). However, a recent bankruptcy case out of the Southern District of California, *Holtorf v. Illinois Student Assistance Commission (In re Holtorf),* 204 B.R. 567 (Bankr.S.D.Cal.1997), applied both the *Johnson* and *Brunner* tests. The *Holtorf* Court noted that under both of these tests the debtor must establish similar elements. While this Court agrees with the Holtorf Court that both the *Johnson* and *Brunner* tests have similarities, it is this Court's opinion that the *Brunner* test provides the clearest application for determining undue hardship and is most consistent with the Congressional intent of § 523(a)(8)(B)—the balance of meeting a debtor's practical needs of avoiding poverty against making the discharge of student loans more difficult than that of other non-excepted debt. *See Brunner,* 831 F.2d at 396.

■ To demonstrate undue hardship under *Brunner,* the debtor must show:

(1) that the debtor cannot maintain, based on current income and expenses, a "mini-

mal" standard of living for herself and her dependents if forced to repay the loans; (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and (3) that the debtor has made good faith efforts to repay the loans.

*Id.* Debtor has the burden to establish all three elements of the *Brunner* test. *Faish,* 72 F.3d at 306. Each element must be satisfied individually before a discharge can be granted. *Id.* If one of the requirements of the test is not met, the Court's inquiry must end with a finding of nondischargeability. *Id.*

1. *First Prong: More than a Showing of Tight Finances.*

■ The first prong requires an examination of a debtor's current financial condition to see if payment of the loans would cause a debtor's current standard of living to fall below that minimally necessary. *Id.* at 305. Upon graduation, a student borrower's outstanding student loans often will exceed a debtor's assets. *Matter of Roberson,* 999 F.2d 1132, 1136 (7th Cir.1993). Under *Brunner,* this is not dispositive. The Court in *Faish* made clear the first prong requires more than a showing of tight finances. *Faish,* 72 F.3d at 306. The proper inquiry is "whether it would be 'unconscionable' to require [the debtor] to take any available steps to earn more income or to reduce her expenses." *Id.* at 307 (quoting *Matthews v. Pineo,* 19 F.3d 121, 124 (3rd Cir.1994), *cert. denied,* 513 U.S. 820, 115 S.Ct. 82, 130 L.Ed.2d 35 (1994)). In *Faish,* debtor's gross yearly salary in 1993 was $27,000 with a student loan payment of $300 per month. The Third Circuit reasoned that full nondischargeability was appropriate because,

in essence, Faish was asking the bankruptcy court to allow a discharge of her student-loan obligation so that she could devote the money (which could otherwise have been earmarked for student-loan payments) to savings for the purchase of a

below the poverty guideline, a lender must establish that the guidelines are unrealistic. *Id.*

new car and to settle into a new apartment.

*Id.* at 307.

■ Here, Debtor's Schedule J shows monthly expenses of $1,788. His net income, at the time of filing the petition in November 1995 was $1,355.65. However, since August 1996, due to the termination of his employment with CCC, Debtor has been living on unemployment benefits of approximately $740.00 per month. If this Court were to order Debtor to make all loan payments—approximately $130,000 paid over 20 years—Debtor would need to pay approximately $1,059 per month.

Based on Debtor's current financial condition, his standard of living would fall well below the "minimally necessary" standard. At worst, Debtor would be left with a negative cash flow or, at best, he would be left with $296.65 per month. In either case, his income is insufficient to cover his legitimate and necessary monthly expenses of $1,788.00. Unlike the debtor in *Faish,* Debtor has no excess money to be earmarked for loan payments. Additionally, this Debtor has taken available steps to earn more money by working while continuing his search for more gainful employment both inside and outside the field of chiropractic medicine. Under these current circumstances, if Debtor is required to pay the loans, he will be unable to maintain a minimal standard of living. This Court concludes that Debtor has demonstrated more than a mere showing of "tight finances." He has shown that payment of $1,059 monthly toward loan debt precludes even a minimal standard of living. Thus, Debtor has satisfied the first prong of *Brunner.*

2. Second Prong: *Additional Circumstances Likely to Persist.*

The second prong requires a debtor to show that a dire financial condition is likely to exist for a significant portion of the repayment period due to "exceptional circumstances." *Brunner,* 831 F.2d at 396. The *Brunner* Court determined that *Brunner* had failed to establish a record of undue hardship because she was not disabled, elderly or had dependents and, therefore, failed to

present evidence indicating a total foreclosure of job prospects. *Id.* at 396–97.

Other courts have discussed "exceptional circumstances." In *Plumbers Joint Apprenticeship and Journeyman Training Committee v. Rosen (In re Rosen),* 179 B.R. 935 (Bankr.D.Or.1995), the court held that because debtor proved the source of his financial troubles arose from extraordinary circumstances—divorce and a debilitating physical injury and since Debtor had minimized expenses while living on worker's compensation benefits—a hardship discharge under § 523(a)(8)(B) was warranted. *Id.* at 941–42. In *Matter of Roberson,* 999 F.2d at 1137, the court held that debtor's lack of transportation, caused by his two drunk driving convictions and wrist and back injuries, was not an insurmountable impediment, but only a temporary one. The debtor in *Roberson* had not shown that his road to recovery was obstructed by the type of barriers which would prevent or delay loan repayment. The *Roberson* Court noted that "exceptional circumstances" may include psychiatric problems, lack of usable job skills, and severely limited education. *Id.* Therefore, these cases suggest that even if a debtor can show a current inability to meet minimal expenses or find gainful employment, then a dischargeability of the loan is inappropriate where a debtor is apparently healthy, presumably intelligent and well-educated, and shows no evidence of extraordinary burdens which would impair future employment prospects.

Here, Debtor stated he has suffered from kidney stones and gout. Debtor also testified that he suffers from no debilitating physical, mental or psychological injury that would prevent him from finding gainful employment. Additionally, Debtor has demonstrated that he is articulate and is capable of interfacing with the public. A strict application of *Brunner* could require this Court to determine, as the *Roberson* Court concluded, "that [D]ebtor's dire straits are only temporary, and thus [Debtor] has failed to demonstrate 'undue hardship' as required … under § 523(a)(8)(B)." *Matter of Roberson,* 999 F.2d at 1137. Accordingly, under a strict interpretation, this Court's analysis could end

because Debtor seems to have failed to meet the second prong of *Brunner*.

However, recent bankruptcy cases throughout the country have explored the strictness of this issue and, as a result, have interpreted broadly their § 105(a) powers. These courts have determined that debtors who are unable to secure well-paying employment are, nevertheless, entitled to an equitable remedy. In a recent case in Florida, the bankruptcy court opined that an unemployed debtor who could not work as a practicing physician due to mental illness and who failed to show that his current financial situation would persist for a significant portion of the repayment period was entitled to an equitable remedy. *Dennehy v. Mae (In re Dennehy)*, 201 B.R. 1008 (Bkrtcy.N.D.Fla. 1996). In *Dennehy*, the debtor had shown that he was capable of working long, hard hours in non-medical fields, despite his mental disorder. Yet the *Dennehy* Court deferred the collection of the debt and the accrual of interest for two years because Debtor had been unable to secure well-paying employment. *Id.* at 1013; *see also, Heckathorn v. United States of America ex rel. U.S. Dept. of Education (In re Heckathorn)*, 199 B.R. 188 (Bkrtcy.N.D.Okla.1996); *O'Donnell v. New Hampshire Higher Education Assistance Foundation (In re O'Donnell)*, 198 B.R. 1 (Bkrtcy.D.N.H.1996); and *Matter of Roberson*, 999 F.2d at 1132 (holding the student loan debt to be nondischargeable, but recognizing the bankruptcy court's two-year deferment of court's order denying discharge to enable debtor to financially reestablish himself). Other courts have also exercised the equitable remedy of partially discharging a debtor's student loan obligations. *See e.g., Griffin v. Eduserv, et al. (In re Griffin)*, 197 B.R. 144 (Bkrtcy.E.D.Okla.1996); *Fox v. Student Loan Marketing Association (SLMA) (In re Fox)*, 189 B.R. 115 (Bkrtcy.N.D.Ohio 1995).

On the other hand, some courts do not interpret § 105(a) process so broadly as it relates to this question and, therefore, refuse to restructure a debtor's student loan debt by deferring payments. However, in *Hinkle v. Wheaton College (In re Hinkle)*, 200 B.R. 690 (Bkrtcy.W.D.Wa.1996), the bankruptcy court concluded that while restructuring was not an available equitable remedy, the court could treat each loan separately for the purpose of dischargeability, provided the loans had not been consolidated by agreement of the parties. *Id.* at 693. In *Hinkle*, the debtor was in her early fifties at the time she sought to discharge her student loan debts totalling approximately $28,000. She obtained a degree in Psychology in 1988 and earned a Masters degree in 1990. While debtor worked at a counseling center for a period of time earning at most $29,500, she was forced to relocate and was unable to find another counseling job. Ultimately, debtor found employment as a secretary earning $25,000 per year with a net monthly income of approximately $1,595. The *Hinkle* Court concluded debtor had fewer years in which to develop her earning potential and it was "unlikely the debtor, at her age and with her earning capacity, [would] be able to afford the increased payments without undue hardship." *Id.* at 694. The Court reasoned that "[e]ven if the payments were amortized over a longer period, it [was] an 'additional circumstance' indicating that her state of affairs [would] persist." *Id.* The *Hinkle* Court concluded that there was no evidence that the six Sallie Mae loans had been consolidated and held that debtor could pay the first three Sallie Mae loans without undue hardship, while the remaining three loans were discharged as undue hardship. *Id.*

■ The *Hinkle* decision is most consistent with the Congressional intent regarding the dischargeability of student loan obligations. The language of § 523(a)(8)(B) is clear and unambiguous. This section provides that a qualifying student loan debt is excepted from discharge, unless repayment would impose an undue hardship. A debtor's liability on a debt encompasses the entire liability, not merely a portion. *Skaggs*, 196 B.R. at 866 (holding that bankruptcy courts do not have the authority to interpose broad equitable powers when the statutory language is clear and unambiguous).[4] Had Con-

---

4. This Court notes that the *Skaggs* Court reached the same result as the *Hinkle* Court, but without applying the *Brunner* three prong test.

gress intended the restructuring of student loans in bankruptcy, it could have provided for dischargeability "to the extent" that payment imposed an undue hardship. *See Hinkle,* 200 B.R. at 693 (citing *Hawkins v. Buena Vista College, et al. (In re Hawkins),* 187 B.R. 294 (Bankr.N.D.Iowa 1995)).

■ If this Court were to order Debtor to make all loan payments of approximately $130,000 over 20 years, Debtor would need to pay approximately $1,059 per month. Debtor has proven the additional circumstance of his inability to find employment. This additional circumstance is likely to exist for a significant portion of the repayment period. While Debtor is likely to find employment in the near future, based on Debtor's employment history since 1982, it is unlikely that his net income would greatly exceed the net salary of $1,355.65 per month he was earning as a lab assistant/instructor at CCC. Rather, the evidence indicates that Debtor has been unable to find any employment (either in or out of the chiropractic field) that would net the kind of minimal income Debtor believes would be required in order to live at minimal standard of living while repaying the loans. Debtor's dire financial condition has already lasted for a significant portion of the repayment period and there is no indication that this additional circumstance will not persist for another seven years.

■ Under *Hinkle,* each student loan obligation, unless consolidated, can be considered separately for purposes of dischargeability. Here, this Court previously determined on motion for summary judgment that the $39,090.20 HEAL loan is nondischargeable under 42 U.S.C. § 292f(g). Therefore, the remaining educational loans of California Student Aid Commission and TERI will now be considered separately for purposes of dischargeability determination.

Debtor's Sallie Mae loans were consolidated and are payable to the California Student Aid Commission in the sum of $79,564.43. When these Sallie Mae loans are considered in combination with the nondischargeable $39,090.20 HEAL loan, repayment of the California Student Aid Commission consolidated Sallie Mae loans would constitute an undue hardship. Debtor's inability to find employment sufficient to live at a minimal standard of living and pay over $1,000 per month in student loan debt is likely to persist for a significant portion of the repayment period. Therefore, as to the California Student Aid Commission loan of $79,564.43, Debtor has established undue hardship under the second prong of *Brunner.*

When the TERI loan of approximately $10,000 is considered in combination with the nondischargeable $39,090.20 HEAL loan, Debtor's inability to obtain employment remains an exceptional circumstance likely to persist for a significant portion of the repayment period. Based on Debtor's employment history, Debtor will not likely obtain employment in the foreseeable future earning $2,000 per month. Accordingly, as to the TERI loan of approximately $10,000, Debtor has established undue hardship under the second prong of *Brunner.*

### 3. Third Prong: Good Faith.

■ The third prong requires a showing of good faith. This Court must find that debtor did not willfully or negligently cause his own default but, rather, the default must have resulted from factors beyond his reasonable control. *Faish,* 72 F.3d at 305. The debtor in *Brunner* filed for a discharge within one month of the date the first loan payments became due. Further, the *Brunner* Court noted that the debtor filed for a discharge without first requesting a deferment of payment. This conduct, the Court concluded, failed to evidence the debtor's good-faith attempt to repay her student loans. *Brunner,* 831 F.2d at 397. *See also, Matter of Roberson,* 999 F.2d at 1136 (stating that good faith is also measured by a debtor's efforts to obtain employment, maximize income and minimize expenses).

■ As to this third prong, the Court concludes that the facts set forth earlier in this *Memorandum Opinion* demonstrates that the debtor has made a good faith effort to repay the loans. The evidence at trial indicates that Debtor made loan payments and requested forbearance for almost six years. Additionally, this Debtor, unlike *Brunner,*

did not file for bankruptcy without first attempting to find employment, request deferment of payment and minimize expenses. Further, there is no indication that Debtor caused his default. Therefore, this Court concludes that Debtor has satisfied the third and final prong of *Brunner.*

## CONCLUSION

This Court recognizes that while Congress may have intended the discharge of student loans to be more difficult than that of other non-excepted debt, this Court also has an obligation to recognize the "fresh start" principles of bankruptcy. Here, Debtor has demonstrated undue hardship under *Brunner.* Though a broad application of § 105(a) is inappropriate given the clear language of § 523(a)(8)(B), this Court adopts the *Hinkle* approach as an effective and permissible means of weighing Congress's intent under § 523(a)(8) against the "fresh start" principles of bankruptcy, i.e., meeting debtor's practical needs while avoiding poverty.

## ORDER

In light of the forgoing, it is

ORDERED, that Plaintiff Shankwiler's California Student Aid Commission loan creates an undue hardship under § 523(a)(8)(B), and therefore, is dischargeable; and it is further

ORDERED, that Plaintiff Shankwiler's TERI loan creates an undue hardship under § 523(a)(8)(B), and therefore, is dischargeable.