In re Thomas A. EAST, Debtor.

Thomas A. East, Plaintiff,

v.

Educational Credit Management Corporation, Defendant.

Thomas A. East, Plaintiff,

v.

U.S. Department of Education, et al., Defendants.

Bankruptcy No. 00–12017–A–7F.

Adversary Nos. 00–1207, 00–1208.

United States Bankruptcy Court, E.D. California.

Oct. 10, 2001.

Thomas H. Armstrong, Doyle, Penner, Bradley & Armstrong, Fresno, CA, for plaintiff.

Miriam Hiser, San Francisco, CA, for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

WHITNEY RIMEL, Bankruptcy Judge.

Trial in each of these adversary proceedings was held July 13, 2001. Following the trial, the court asked for post-trial briefing, and both matters were submitted as of August 3, 2001. In each adversary proceeding, plaintiff and debtor, Thomas A. East, seeks to have a student loan obligation declared dischargeable under 11 U.S.C. § 523(a)(8). In Adversary No. 00–1207, East v. Education Credit Management Corporation ("ECMC"), East asks the court to determine dischargeable his obligation to ECMC under two loans, one in the amount, as of July 5, 2001, of $4,485.63, and the other in the amount, as of July 5, 2001, of $3,845.66. In Adversary No. 00–1208, East asks the court to determine dischargeable his obligation to the U.S. Department of Education (the "Department of Education") in the amount, as of June 4, 2001, of $103,708.63, including both principal and interest.

This memorandum contains findings of fact and conclusions of law required by Federal Rule of Bankruptcy Procedure 7052 and Federal Rule of Civil Procedure 52. This is a core proceeding as defined in 28 U.S.C. § 157(b)(2)(A) and (I).

Although, as will be seen, the court's judgment will be different in the respective adversary proceedings, the legal and factual issues raised by the adversary proceedings are identical. The proceedings were tried jointly. The parties to both proceedings submitted to the court a statement of stipulated facts applicable to both proceedings. Therefore, this memorandum will set forth the court's findings and conclusions with respect to each adversary proceeding. Separate judgments will be entered in each adversary proceeding.

*Background facts.*

Mr. East is 37 years old. From 1982 to 1987, East attended California State University at Fresno ("CSUF") and obtained a Bachelor of Science degree in industrial engineering. While at CSUF, he received a student loan from ECMC. East is indebted to ECMC under two loans. Under the first loan, as of July 5, 2001, he owed $4,089.12 in principal with unpaid interest in the amount of $396.51 for a total outstanding indebtedness of $4,485.63. The first loan is a variable rate loan, which bore interest, as of the trial date, at the annual rate of 6.71%. Under the second loan, as of July 5, 2001, East owed $3,492.79 in principal with unpaid interest in the amount of $352.87, for a total outstanding as of July 5th of $3,845.66. The second loan is a semi-fixed rate interest loan bearing interest as of the trial date at the annual rate of 10%. East made payments to ECMC until he began law school. Then he obtained a deferment of payments and eventually resumed payments for a couple of months. When the bankruptcy was filed, he was under a forbearance program with ECMC.

East married in 1992, and he and his wife worked at Menicon, a contact lens manufacturer. The Easts have three sons. As of the trial date, Jacob was 9, Clayton was 8, and Billy was 6.

East began law school at San Joaquin College of Law in Fresno, California, in the fall of 1993. He applied for and obtained a student loan from the Department of Education. He has made no payments to the Department of Education on its loan. He is in "good standing" with the Department of Education because up until the time he filed his bankruptcy petition, he had entered into forebearance agreements excusing his nonpayment. East has been made aware of the various repayment options, deferrals, and forebearances available to him under the Department of Education regulations at 34 C.F.R. 685.

East obtained his J.D. degree from San Joaquin College of Law in May 1997. San Joaquin College of Law is an accredited non-ABA law school. East never took the California bar exam. The current estimated cost for a bar review course in California is $3,500, and the bar registration fee is approximately $600. The overall February 2001 California bar passage rate was 37%, while the first time passage rate was 52%, and the pass rate from accredited non-ABA law schools was 29%.

The Easts' son Billy was born at the beginning of his second year of law school. After Billy's birth, Mrs. East was given a promotion at her job, which required her to work "on the road." The Easts' plan was that when Mr. East became a lawyer, they would have two incomes and they would be able to pay both student loans.

In 1995, Mr. East went to work for Silton as an industrial engineer. He worked there for four and one-half years and by 1999, when he was fired, he was making $42,000 a year.

Mrs. East, meanwhile, was traveling more and more with her job, and she eventually stopped coming home and moved out. Mr. and Mrs. East tried to get back together but in late 1996, they started divorce proceedings, and in March 1997 their divorce became final. At that time, the younger boys were 4 years old and one and one half years old. Mr. East continued working and going to law school. Formerly, the Easts owned their own home in Clovis, California. In 1996, they lost the home to foreclosure. Mrs. East's parents bought the house and then rented it to the Easts for a period of time.

In May 1997, Mr. East graduated from San Joaquin College of Law. At that point, he was employed with Silton and was taking care of the three boys. He simply did not have the time nor the money to take the California bar exam and did not take it. Mrs. East was giving no support to the family at this point, and has paid no support since then. She has, according to Mr. East, abandoned the family, and he believes she has a substance abuse problem.

Mr. East's son, Clayton, is disabled. His disability is a "central auditory processing" disability. According to Mr. East at trial, this means that something is wrong with the connection from the inner ear to the brain. As a consequence, Clayton has a difficult time with sounds and communication. He requires special scholastic, parental, and medical attention. He is achieving below kindergarten level, but nonetheless is going into third grade. Mr. East testified that Clayton may or may not have these problems for the rest of his life. At this point, Mr. East simply does not know.

After law school, Mr. East continued to work at Silton, but in July 1999, he was fired. He looked for work in the industrial engineering field, but because he was not a new graduate and had no experience in

food processing, a field in demand in the Fresno area, he could not find a job in industrial engineering. As pointed out above, he did not have the funds nor the time to take the California bar exam. Therefore, he decided to teach. East has a valid California Multiple Clear Teaching credential.

His mother, who lives in Reedley, California, helped him get a job at Grant Middle School in Reedley. That job provides retirement benefits as well as other benefits to Mr. East and his family. Although he has looked sporadically for jobs in the engineering field, he has not received any job offers.

In fall 2001, Mr. East's salary will be $40,165 as a school teacher. He has chosen a medical insurance plan that requires from him a monthly contribution of $292. However, there is an insurance plan available to him through Kaiser that would likely cost him far less each month, according to plaintiff's Exhibit 2.

Also, Mr. East is coaching and is teaching summer school. He has put his name on the list to substitute at year round schools.

His three children are in child care, which costs $500 per month. He rents a modest house in Clovis, California, which requires him to commute between Clovis and Reedley. However, the Clovis School District is beneficial, particularly for Clayton right now.

Mr. East's budget was admitted as plaintiff's Exhibit 8. As of June 27, 2001, his monthly gross wage was $3,347.08. There were payroll deductions that totaled $916.01. In addition to that average monthly net salary of $2,431.07 per month, he estimated an average extra net over a twelve month period from summer school teaching and coaching of $418 per month, for an average monthly net income of $2,849.13 per month. His expenses are for the most part commensurate with his income. His rent is $850 per month. His electricity bill of $150 per month seems somewhat high, but he did testify at trial that he is trying very hard to lower it. He pays $60 per month for water and sewer; $25 per month for telephone; $34 per month for basic cable; and $50 per month for home maintenance. His food budget is $115 to $145 per week. Mr. East expects to buy his children's clothing at Salvation Army and to buy their shoes at Payless Shoes. One son has allergies, and one son needs orthodontia, so his uninsured medical dental expenses he estimates at $107 per month. Transportation he estimates at $200 per month. He has back taxes, penalty and interest to pay, so in addition to his with-holding, he is paying about $100 per month in taxes. His insurance expenses are $33 a month for life, and $70 a month for car, assuming he keeps a car. The only expense that was challenged at trial was his recreation expense. That is $238.33 per month, which includes $179 a month for martial arts training for his three sons. He also estimates $12.50 a month for baseball expenses for two of the sons; $11.83 expenses for soccer for two of the sons; and $35 a month for movies, pizza, and donuts for him and his sons.

His total expenditures according to Exhibit 8 were $3,076.66 per month. Thus, according to his budget, there is a deficit.

Admitted as an exhibit was a Kings Canyon Unified School District 2000–2001 certificated salary schedule. It is clear from this salary schedule that if Mr. East remains in the Kings Canyon Unified School District as a teacher, he can expect to receive periodic increases in pay. The parties all agreed that the cost of living will increase as well.

Mr. East is considering several options. He is considering moving to Reedley so

that his commuting expense will be lower. This is problematic because of the educational needs of Clayton, which Mr. East feels are best addressed in the Clovis School District. Alternately, Mr. East could seek a teaching job in Clovis, which would lower his transportation expense and probably increase his salary. Assuming he could obtain such a job, he is to some extent reluctant to do it, because he will soon obtain tenure in the Kings Canyon Unified School District.

The extra tax payments that Mr. East now is obligated to make will change over time, but he believes that he will end up owing even more than he does now to the Internal Revenue Service because he made additional mistakes on his itemized deductions.

East is reluctant to become a school administrator and obtain a higher salary that way because it would cost him $2,000 to $3,000 to get the necessary training and that training would take a great deal of time.

It is Mr. East's understanding that Clayton does not qualify for supplemental security income because his disability is not deemed "medical."

East considered entering into the income contingent repayment plan with the Department of Education. However, that plan would have required him to pay $407.68 per month, and he concluded that he simply could not do that right now. Thus, he entered into a forbearance agreement.

Mr. East has worked through the Fresno County District Attorney to try to collect child support from Mrs. East but he is not hopeful that he will be able to collect any child support.

Basically, Mr. East has now borrowed a principal amount of over $88,000 from the Department of Education for a law school education that he believes he will not use. Due to family circumstances, he never considered signing up to take the California bar exam. Additionally, he thinks that his current circumstances make it an undue hardship for him to pay the smaller amount of under $10,000 in principal owed to ECMC. To some extent, he *has* utilized the education provided by the loans by ECMC. While he is not employed as an engineer, he is utilizing that education and utilizing his teaching credential, which he obtained while attending CSUF.

*Applicable Law.*

11 U.S.C. § 523(a)(8) provides in relevant part that:

> "A discharge under § 727 ... does not discharge an individual debtor from any debt—for an educational benefit overpayment or loan made, insured or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution, or for an obligation to repay funds received as an educational benefit, scholarship, or stipend, unless excepting such debt from discharge under this paragraph will impose an undue hardship on the debtor and the debtor's dependents."

The loans at issue in these adversary proceedings both fall within the ambit of § 523(a)(8). The question is whether repaying those loans would be an undue hardship for the plaintiff.

Undue hardship is not defined by the Bankruptcy Code. The Ninth Circuit of Appeals "has recognized that the existence of the adjective 'undue' indicates that Congress viewed garden-variety hardship as insufficient excuse for a discharge of student loans." *In re Rifino,* 245 F.3d 1083, 1087 (9th Cir.2001), quoting *In re Pena,* 155 F.3d 1108, 1111 (9th Cir.1998). In *Pena,* the Ninth Circuit adopted the

test found in *Brunner v. New York State Higher Education Services Corp.*, 831 F.2d 395 (2nd Cir.1987). This test requires a debtor who wishes to obtain a discharge of his student loan obligation under § 523(a)(8) to prove the following:

"(1) that the debtor cannot maintain, based on current income and expenses, a 'minimal' standard of living for herself and her dependents if forced to repay the loans; (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and (3) that the debtor has made good faith efforts to repay the loans."

*In re Brunner*, 831 F.2d at 396.

■ The burden of proving undue hardship is on the debtor, and the debtor must prove all three elements to establish undue hardship.

### The partial discharge issue.

May a bankruptcy court determine that it would be an undue hardship for a debtor to repay all of the student loan in question but not an undue hardship to have to repay part of it? That seems to be, at a minimum, an open issue in the Ninth Circuit right now.

In 1998, the Ninth Circuit Bankruptcy Appellate Panel decided *In re Taylor*. 223 B.R. 747 (9th Cir. BAP 1998). In that case, the bankruptcy court had entered an order granting the debtors a partial discharge of their student loan obligation. The bankruptcy appellate panel considered whether a partial discharge was appropriate under the terms of the Bankruptcy Code. The panel decided that the bankruptcy court had erred by partially discharging the student loan. The court stated that "the plain language of § 523(a)(8) supports Appellants' position that the entire student debt is *either* nondischarge-able or dischargeable on the basis of undue hardship." *Id.* at 752. The statute states that student loans will be discharged if "excepting such debt from discharge will impose an undue hardship on the debtor and the debtor's dependents."

"Section 101(12) defines the term 'debt' as 'liability on a claim.' 11 U.S.C. § 101(12). Section 101(5) defines the term 'claim' as a 'right to payment, whether or not such right is ... secured or unsecured ...' 11 U.S.C. § 101(5). Plainly understood, 'liability on a claim' encompasses the entire liability, not merely some portion of the debt or merely selected terms of repayment."

*Id.*

The bankruptcy appellate panel pointed out that Congress could have allowed a discharge "to the extent" that such debt will cause undue hardship. Congress included the phrase "to the extent" in other subdivisions of the dischargeability statute but failed to include it in § 523(a)(8). Therefore, the bankruptcy appellate panel concluded that § 523(a)(8) did not authorize a partial discharge of student loans.

This decision has been called into question, although not directly reversed, by the Ninth Circuit Court of Appeals. *In re Myrvang*, 232 F.3d 1116 (9th Cir.2000). It has also been called into question by bankruptcy courts within the Ninth Circuit and by at least two district courts within the circuit. *See, In re Saxman*, 263 B.R. 342 (W.D.Wash.2001); *In re Brown*, 239 B.R. 204 (S.D.Cal.1999); *In re England*, 264 B.R. 38 (Bankr.D.Idaho 2001). While the *Myrvang* case did not involve a student loan, the court of appeals addressed the partial discharge issue by way of analogy.

The facts in *Myrvang* were as follows. Steve and JoAnn Myrvang appealed the district court's order affirming the bankruptcy court's ruling that Mr. Myrvang's

debt to his former spouse was nondischargeable. They further argued that the district court erred in affirming the bankruptcy court's grant of a partial discharge of Mr. Myrvang's debt to his former spouse. The Ninth Circuit concluded "that the bankruptcy court acted within its equitable powers in ordering a five-year repayment plan and the partial discharge of Mr. Myrvang's debt" to his former spouse. 232 F.3d at 1118.

As to the partial discharge issue, the Myrvangs maintained that "nothing in the language of § 523(a)(15) authorizes the bankruptcy court to issue an order of partial discharge. Instead, they assert, a bankruptcy court is compelled to make an all-or-nothing choice." *Id.* at 1122.

The Ninth Circuit Court of Appeals first observed that the Myrvangs' position "admittedly has some support in case law." *Id.* The court then discussed the bankruptcy appellate panel's decision in *Taylor* and observed that the BAP had "reasoned that the plain language of § 523(a)(8), which provided for the nondischargeability of student loans unless exempting 'such debt' from discharge would cause undue hardship, prohibited partial discharge." *Id.* at 1123. The court went on to state that the *Taylor* decision "has already elicited criticism." *Id.*

Additionally, the Ninth Circuit observed that in *In re Hornsby,* the Sixth Circuit Court of Appeal "has rejected the notion that a bankruptcy court lacks the power to order a partial discharge of a separate liability." *Id.,* discussing *In re Hornsby,* 144 F.3d 433 (6th Cir.1998). The Ninth Circuit appeared to accept the *Hornsby* logic. The court stated:

> "The [Hornsby] court reasoned that 11 U.S.C. § 105(a) permits a bankruptcy court to order a partial discharge. [citation omitted] ...
>
> ...

Addressing the context of student loan discharges under § 523(a)(8), the [Hornsby] court reasoned ·that 'where undue hardship does not exist, but where facts and circumstances require intervention in the financial burden on the debtor, a all-or-nothing treatment thwarts the purpose of the Bankruptcy Act.' *In re Hornsby,* 144 F.3d at 439. We agree with the Sixth Circuit's reasoning in *In re Hornsby.*"

■ The Ninth Circuit's decision in *Myrvang,* while not explicitly overruling *Taylor,* provides clear guidance that the court of appeals disagrees with the BAP's conclusion in *Taylor.* Therefore, this court will consider whether a partial discharge would be appropriate in either adversary proceeding here.

The language that the Ninth Circuit quoted from *Hornsby* about an all-or-nothing treatment thwarting the purpose of the Bankruptcy Act was made in the context of a discussion of the applicability of Bankruptcy Code § 105(a) to dischargeability under § 523(a)(8). What the Sixth Circuit Court of Appeals said was:

> "[W]e believe [the bankruptcy court] had the power to take action short of total discharge. We find this authority in 11 U.S.C. § 105(a), which permits the bankruptcy court to 'issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title,' so long as such action is consistent with the Bankruptcy Act. [citation omitted] ... In a student-loan discharge case where undue hardship does not exist, but where facts and circumstances require intervention in the financial burden on the debtor, an all-or-nothing treatment thwarts the purpose of the Bankruptcy Act.
>
> The scope of equitable power in student-loan discharge cases is as yet undefined."

*In re Hornsby,* 144 F.3d 433, 439 (6th Cir.1998).

The *Hornsby* court concluded as follows, after a review of various decisions from other courts:

"Where a debtor's circumstances do not constitute undue hardship, some bankruptcy courts have thus given a debtor the benefits of a 'fresh start' by partially discharging loans, whether by discharging an arbitrary amount of the principal, interest accrued, or attorney's fees; by instituting a repayment schedule; by deferring the debtor's repayment of the student loans; or by simply acknowledging that a debtor may reopen bankruptcy proceedings to revisit the question of undue hardship. We conclude that, pursuant to its powers codified in § 105(a), the bankruptcy court here may fashion a remedy allowing the Hornsby's ultimately to satisfy their obligations to [the student loan creditor] while at the same time providing some of the benefits that bankruptcy brings in the form of relief from oppressive financial circumstances."

*Id.* at 440.

Thus, both the Sixth Circuit and the Ninth Circuit appear to have concluded that a "partial discharge" of a student loan obligation is an option in a dischargeability proceeding under § 523(a)(8). However, despite the language in *Myrvang* approving *Hornsby,* the Ninth Circuit Court of Appeals does not appear explicitly to have endorsed the concept of a partial discharge where undue hardship has not been demonstrated.

The Post Trial Brief of the United States, representing the Department of Education, described very well the dilemma for courts trying to reconcile the language of *Hornsby* and *Myrvang* with the language of § 523(a)(8). The United States expressed it this way:

"*Hornsby* seems to swallow whole the statutory exception to discharge mandated by Congress in the case of student loans. The statute requires a showing of undue hardship to discharge student loan debts. 11 U.S.C. § 523(a)(8). *Hornsby* seems to hold that even if undue hardship does not exist, the bankruptcy courts can still discharge educational loans. A formulation of the *Hornsby* holding that does not vitiate the statute entirely is to read it as authorizing discharge of the portion of student loan debt that imposes an undue hardship, even if that amount is less than the entire debt." [1]

It is, then, a reasonable analysis that if the debtor meets his or her burden of demonstrating that it would be an undue hardship for the entire amount of the loan to be nondischargeable, the court may consider whether it would be an undue hardship for some part of the loan obligation not to be discharged. This may well be what the Sixth Circuit in *Hornsby* intended to convey.

*Undue hardship and the ECMC obligation.*

The court is not persuaded that Mr. East has met his burden of proof that it would be undue hardship to repay the ECMC obligation. As of early July 2001, the total principal and interest on the ECMC obligation was $8,331.29. As to the ECMC obligation, the court does not believe that all of the prongs of the Pena/Brunner test have been met. While Mr. East's income now is not sufficient, given his expenses, for him to make significant inroads on the obligation, he has not shown that additional circumstances exist indicating that this state of affairs is likely

---

**1.** United States' Post Trial Brief filed August 3, 2001, at p. 4.

to persist for a significant period of the repayment portion. In fact, the evidence was that Mr. East will receive salary increases over time. Additionally, as an experienced teacher, jobs in other school districts that may pay more than the Kings Canyon Unified School District are available to him. He is, in fact, considering applying to the Clovis School District. He has made payments on the ECMC obligation and he has, in the court's view, met the third prong of showing good faith efforts to repay the loans.

For the most part, Mr. East's expenses are reasonable and even minimal given his obligations as a single parent of three young boys, one of whom suffers from a disability. However, the $238.33 expense per month for recreation is, under Mr. Easts' circumstances, excessive. In particular, $179 a month for martial arts is excessive. Also, there was evidence before the court that Mr. East could obtain health insurance for far less than he is currently paying, and he presented no reason why he should not do so. The cable television expense of $34 per month is not part of a minimal standard of living.

For the above reasons, judgment will be entered for defendant Educational Credit Management Corporation in Adversary Proceeding No. 00–1207.

*Undue hardship and the Department of Education.*

The undue hardship inquiry is more complex with respect to the Department of Education because the loan amount is far greater. As of early June 2001, the total amount owed was $88,711.20 in principal and $14,997.43 in interest, for a total of $103,708.63. Even if Mr. East reduces his expenses along the lines described above to reduce his health insurance expense and the martial arts expense and eliminate cable television; and even if he receives pay increases as a teacher and/or obtains a teaching job at a school district that pays more, the court is persuaded that given his expected income and the expenses of raising three sons on his own, it would be an undue hardship for him to repay this amount in full. Thus, the partial discharge issue arises.

It is worth noting that the income contingent repayment plan available to Mr. East under the regulations promulgated at 34 C.F.R. § 685.209 will effectively allow him, if certain requirements are met, a discharge of any unpaid portion of the loan at the end of the 25 year repayment period. See, 34 C.F.R. § 685.209(c)(4)(iv)("If a borrower has not repaid a loan in full at the end of the twenty five-year repayment period under the income contingent repayment plan, the Secretary cancels the unpaid portion of the loan.")

The United States has argued that Mr. East has not met the three prongs of the *Brunner* test. According to the United States, he has not established a good faith effort to repay the loans nor that additional circumstances exist indicating that his inability to make payments is likely to persist for a significant period of time. Nonetheless, the United States suggests in its post-trial brief that the court might discharge the interest and rule that the obligation to pay principal, as nondischargeable, could be revisited at some future time, perhaps in five years.

Mr. East has established that based on current income and expenses, even as adjusted with respect to expenses, he cannot maintain a minimal standard of living if forced to repay the Department of Education loan now. He has met the first prong of the Brunner/Pena test.

In the court's view, he has also demonstrated good faith efforts to repay the loans. Good faith, under *Brunner*, is defined as a substantial effort to minimize

living expenses and "realize opportunities from one's education and resources." *In re Brown*, 239 B.R. at 209 (citations omitted). The court "must find that debtor did not willfully or negligently cause his own default but, rather, the default must have resulted from factors beyond his reasonable control." *In re Shankwiler*, 208 B.R. 701, 708 (Bankr.C.D.Cal.1997).

Mr. East works as a full-time teacher even though he has an undergraduate degree in engineering and a J.D. degree. In the past, he worked as an engineer with wages as high as $55,000 a year in 1999. He was terminated from his position because of time conflicts due to activities involved with the care of his children. He has never worked as a lawyer and has not taken the California bar exam to become a licensed attorney. Mr. East's current teaching position will likely soon be tenured. It allows him, a single parent, a reasonable salary and the hours and flexibility to care for the needs of his three children. There was no evidence that he has tried to depress his income artificially so as to be not able to pay his educational loans. Rather, the evidence is that he chose teaching because of family pressures, the inability to find an engineering job, and the lack of funds to take the bar exam.

The good faith inquiry also looks to see whether the debtor has tried to repay his student loan obligations since they were incurred, has made efforts to renegotiate the loans, to obtain deferments, and to minimize expenses and increase income. The mere failure to make payments on the loan does not, in and of itself, show lack of good faith. *In re Brown*, 239 B.R. at 209.

Here, Mr. East made payments to his ECMC student loan until he entered law school when he obtained a deferment. However, the student loans owned by the U.S. Department of Education and the ECMC have remained in either deferment or forbearance status since his law school graduation.

During the years 1996–1999, Mr. East had serious problems. His wife left him and their sons, he lost his house to foreclosure, and he was left raising three young children, one with a learning disability. Mr. East lacked the resources to make student loan payments to the Department of Education but did avail himself of the forbearance and deferment options to keep his loans in good standing thus satisfying the prong of good faith. East is, and has been, in good standing with the Department of Education by obtaining forebearances and attempting to negotiate an income contingent repayment plan.

The more troubling issue with respect to undue hardship is whether additional circumstances exist indicating that his current financial predicament is likely to persist for a significant portion of the repayment period. This is where the partial discharge option arises.

The court is not persuaded that the option of deferring an ultimate decision on dischargeability of the Department of Education loan is viable. Dischargeability determinations under § 523 of the Bankruptcy Code should be made expeditiously.

The court has concluded, based on the evidence at the trial, that Mr. East has met his burden of proof with respect to the additional circumstances prong as to some but not all of the obligation to the Department of Education. Over the years, his income as a teacher will increase. Additionally, he has the education to engage in other occupations. He is a qualified industrial engineer, and he has successfully completed law school and received his juris doctor. Thus, as his children get older, he will be able, should he choose to do so, to seek employment as a lawyer (after pass-

ing the California bar exam) or as an engineer. He is qualified for three separate professions-engineering, teaching, and law.

Further, as his children grow up, his expenses will decrease, not even taking into consideration the savings that could currently be obtained from eliminating the martial arts expense and cable television and using less expensive health insurance. Thus, over the next twenty five years (the period for the income contingent repayment plan), Mr. East is likely to have an income that substantially exceeds the expenses necessary to maintain a minimal standard of living.

The following chart demonstrates, simply by way of example, the monthly payments that would be required for Mr. East to pay his obligation to the Department of Education under various time tables and assuming the principal balance of, variously, $88,711 (the current principal balance not including past due unpaid interest) or $44,000.[2] Interest is calculated at 8.25%.[3]

| Beginning Principal Balance | Months/Years To Repay | Monthly Payment |
| --- | --- | --- |
| $88,711 | 120 months/10 years | $1088 |
| $88,711 | 180 months/15 years | $ 862 |
| $88,711 | 300 months/25 years | $ 700 |
| $44,000 | 120 months/10 years | $ 540 |
| $44,000 | 180 months/15 years | $ 427 |
| $44,000 | 300 months/25 years | $ 346 |

This chart gives an indication of the payments that Mr. East would need to make to pay his obligation to the Department of Education at the current principal balance not including interest, both at $88,711 and at $44,000. Of course, it is possible (and even likely) that he would pay less in the beginning years and more in the later years as his expenses of raising a family decrease, as he pays his tax debt and the ECMC obligation, and as his income increases.

Mr. East has the burden of proof on undue hardship. The court concludes that he has met that burden of proof to the extent that the obligation to the Department of Education exceeds $44,000. Therefore, to the extent that the obligation exceeded $44,000 at the time of trial, the obligation is dischargeable. However, he has not met his burden of proof to the extent that the obligation did not exceed $44,000 at the time of trial. Therefore, judgment will be entered determining the obligation of plaintiff to the United States Department of Education to be nondischargeable in the amount of $44,000 as of the date of entry of this order. Interest will accrue on that principal obligation from and after the date of judgment. To the extent permitted by applicable regulations, the various repayment options set forth in the Code of Federal Regulations or in other applicable statutes and regulations are available for repayment of this nondischargeable obligation, and for that owing to ECMC. The court will issue separate judgments with respect to each adversary proceeding.

---

2. The court made these calculations using a computer program. To the extent that it becomes relevant and the parties believe that the calculations are in error, they are invited to file a motion to alter or amend the findings pursuant to Federal Rule of Bankruptcy Procedure 9023.

3. This is the interest rate for the loan.