**In re:** Steven Lynn HORNSBY; Teresa Lynn Hornsby, Debtors.

**TENNESSEE STUDENT ASSISTANCE CORPORATION, Appellant,**

v.

**Steven Lynn HORNSBY; Teresa Lynn Hornsby, Appellees.**

Nos. 96–6320, 96–6321.

United States Court of Appeals, Sixth Circuit.

Argued by Appellant March 18, 1998.

Submitted by Appellees March 18, 1998.

Decided June 9, 1998.

Teresa C. Azan (argued and briefed), Office of the Attorney General for the State of Tennessee, Tax Division, Bankruptcy Unit, Nashville, TN, Charles W. Burson, Office of the Attorney General, Nashville, TN, for Appellant.

Albert B. Merkel (briefed), Merkel & Tabor, Jackson, TN, for Appellees.

Before: KENNEDY and SILER, Circuit Judges; COHN, District Judge.*

## OPINION

COHN, District Judge.

This is a bankruptcy appeal. Chapter 7 debtors Steven and Teresa Hornsby sought discharge of approximately $30,000 of student-loan debt. The Tennessee Student Assistance Corporation (TSAC), which had guaranteed the loans, opposed discharge. The bankruptcy court determined that the

---

* The Honorable Avern Cohn, United States District Judge for the Eastern District of Michigan, sitting by designation.

Hornsbys' student loans should be discharged pursuant to 11 U.S.C. § 523(a)(8)(B)[1] because repayment of the loans would constitute an undue hardship. After a remand for a specific finding as to whether the Hornsbys' financial circumstances were likely to improve, the district court ultimately affirmed the bankruptcy court's decision that the student loans should be discharged.

On appeal, TSAC asserts that the Hornsbys' financial situation is not so exceptional to entitle them to discharge of their student loans. For the following reasons, we will reverse.

## I.

Steven and Teresa Hornsby are married and have three young children. On May 25, 1993, the Hornsbys filed a voluntary Chapter 7 petition. The Hornsbys had by that date accumulated more than $30,000 in debt, stemming almost entirely from student loans. The Hornsbys initiated an adversary proceeding to obtain a discharge of their student loans on grounds of undue hardship.

After conducting a dischargeability hearing, the bankruptcy court made the following findings of fact with respect to the Hornsbys' debt. The Hornsbys were college students from 1987 until 1992, during which time they applied for and received fourteen student loans. Ultimately, Steven received five and Teresa received six subsidized Guaranteed Student Loans in principal amounts averaging approximately $2000; Steven also received two supplemental, or unsubsidized, educational loans, while Teresa received one such loan, in principal amounts ranging from $1000 to $2000.[2] TSAC, which is a nonprofit corporation created to administer student assistance programs in Tennessee, guaranteed the loans. The Hornsbys attended a succession of small Tennessee state colleges. Both studied business and computers, but neither graduated. Although the Hornsbys received several deferments and forbearances on the loans, they ultimately defaulted prior to making any payments. At the time of the dischargeability proceeding, interest had accumulated on the loans such that Steven was indebted to TSAC for $15,058.52 and Teresa was indebted to TSAC for $18,329.15.

The bankruptcy court first concluded that the Hornsbys were not capable of paying their student loans and maintaining a minimal standard of living. At the time of the dischargeability proceeding, Steven was working for AT & T in Dallas, Texas; he made $6.53 per hour, occasionally working limited overtime hours. Teresa was employed by KinderCare Learning Center. Although she had begun work in Tennessee, she had transferred to become the director of a child-care facility in Dallas, Texas. Teresa was earning $17,500 per year with medical benefits at the time of the hearing. In monthly net income, Steven earned approximately $1083.33 and Teresa earned $1473.33, amounting to $2556.66 of disposable income per month.

The Hornsbys' reported monthly expenses came to $2364.90. The Hornsbys therefore

---

1. The statute reads:
   (a) A discharge under ... this title does not discharge an individual debtor from any debt—
       \*    \*    \*    \*    \*    \*
   (8) for an educational benefit overpayment or loan made, insured or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution, or for an obligation to repay funds received as an educational benefit, scholarship or stipend, unless—
       \*    \*    \*    \*    \*    \*
   (B) excepting such debt from discharge under this paragraph will impose an undue hardship on the debtor and the debtor's dependents. ...

11 U.S.C. § 523(a)(8)(B).

2. These student loans have relatively low interest rates and are today available through the Federal Direct Student Loan (FDL) Program or the Federal Family Education Loan (FFEL) Program. "FDL and FFEL loans to students are collectively called Stafford Loans and can be subsidized (for low-income students) or unsubsidized (for others)." Patricia Somers & James M. Hollis, *Student Loan Discharge Through Bankruptcy*, 4 AM. BANKR INST. L. REV. 457, 459 (1996). The federal government pays accruing interest on subsidized loans while the student-debtor attends college or graduate school; interest accrues on an unsubsidized loan while the student-debtor attends school.

operated with a monthly surplus of $191.76 to $280.43, depending on whether Steven earned overtime for a particular month. TSAC argued that the Hornsbys did not "tighten their belts." The bankruptcy court found the Hornsbys' expenses to be reasonable. For example, the Hornsbys sold a car and incurred debt to purchase a newer used car, which then resulted in even more repair expenses. Although the bankruptcy court conceded that the new-car expenditure might have been ill-advised, the bankruptcy court found that they purchased the car in the good-faith belief that it would decrease their expenses. The Hornsbys also moved from Tennessee to Texas, thereby increasing their monthly rental expense by $200. The bankruptcy court found nothing wrong with the move, determining that while it was more expensive to live in Texas, the move was necessitated by a need for greater job security. TSAC further challenged the Hornsbys' relatively high bills for telephone use, electricity, meals eaten out, and cigarettes, which the bankruptcy court did not directly address.

Finally, TSAC argued that the Hornsbys' income well exceeded the standard for a family of five established in the Poverty Guidelines of the Department of Health and Human Services for 1993 and 1994. In 1995, the bankruptcy court acknowledged, the Hornsbys' projected income would exceed $36,000, while the 1995 poverty guideline for a family of five was $17,710.[3] Without elaboration, the bankruptcy court stated that it was well aware of the discrepancy but that the Hornsbys had understated their expenses. At the hearing, Steven had testified that, on four occasions over the past year, he had been unable to pay all bills because of unexpected expenses. The bankruptcy court therefore concluded that the Hornsbys could not pay their loans and maintain a minimal standard of living and, further, that their circumstances were not likely to improve. The bankruptcy court also found that the Hornsbys had acted in good faith: although they had not made payments toward the loans, they had exercised all deferment and forbearance options. The bankruptcy court

ordered a discharge of student-loan debt totaling $33,387.67.

TSAC appealed the bankruptcy court's decision to the district court, which affirmed with respect to the Hornsbys' present inability to repay the loans but found that the bankruptcy court had impermissibly shifted the burden to TSAC in analyzing the Hornsbys' future prospects. The district court remanded the case for further findings as to the likelihood of the Hornsbys' financial situation improving. On remand, the bankruptcy court made additional findings of fact, chiefly finding that the earning capacity of Steven and Teresa Hornsby was likely to remain relatively constant for many years. Although the Hornsbys' day-care expenses might disappear over time, the bankruptcy court found that any additional money saved would not be significant. On appeal, the district court affirmed the bankruptcy court's findings.

## II.

A decision that student loans impose an undue hardship "is a question of law subject to *de novo* review." *Cheesman v. Tennessee Student Assistance Corp.* (*In re Cheesman*), 25 F.3d 356, 359 (6th Cir.1994), *cert. denied,* 513 U.S. 1081, 115 S.Ct. 731, 130 L.Ed.2d 634 (1995). The factual findings underlying the decision will be set aside only if clearly erroneous—in other words, if we are "left with the definite and firm conviction that a mistake has been committed." *See United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948); *see also* FED. R. BANKR.P. 8013 ("Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses.").

## III.

### A.

The dischargeability provision at issue, § 523(a)(8), was enacted to prevent indebted

---

**3.** *See* Annual Update of HHS Poverty Guidelines, 60 Fed.Reg. 7772, 7772 (1995).

college or graduate students from filing for bankruptcy immediately upon graduation, thereby absolving themselves of the obligation to repay their student loans. *See Cheesman*, 25 F.3d at 359 (citing *Andrews University v. Merchant (In re Merchant)*, 958 F.2d 738, 740 (6th Cir.1992)).[4] Thus a debtor who has student loans which became due fewer than seven years before filing for bankruptcy must repay the loans unless she demonstrates that repayment would constitute an undue hardship. *See* 11 U.S.C. § 523(a)(8)(B). Congress has not defined "undue hardship," leaving the task to the courts. Courts universally require more than temporary financial adversity and typically stop short of utter hopelessness. *See* Robert F. Salvin, *Student Loans, Bankruptcy, and the Fresh Start Policy: Must Debtors Be Impoverished to Discharge Educational Loans?*, 71 TUL. L.REV. 139, 149–53 (1996).

■ Courts have chiefly compensated for lack of a definition by devising tests to measure undue hardship. *See id.* at 149. Declining to adopt any one test, we instead look to many factors. *See Cheesman*, 25 F.3d at 359; *see also Rice v. United States (In re Rice)*, 78 F.3d 1144, 1149 (6th Cir.1996).[5]

We have considered the three factors set forth in *Brunner v. New York State Higher Educ. Serv. Corp.*, 831 F.2d 395 (2d Cir.1987) (per curiam), which is the test that has been most widely applied:

> One test requires the debtor to demonstrate "(1) that the debtor cannot maintain, based on current income and expenses, a 'minimal' standard of living for herself and her dependents if forced to repay the loans; (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period . . . ; and (3) that the debtor has made good faith efforts to repay the loans."

*Cheesman*, 25 F.3d at 359 (quoting *Brunner*, 831 F.2d at 396).[6] A bankruptcy court might also consider, among other things, "the amount of the debt . . . as well as the rate at which interest is accruing" and "the debtor's claimed expenses and current standard of living, with a view toward ascertaining whether the debtor has attempted to minimize the expenses of himself and his dependents." *Rice*, 78 F.3d at 1149.[7]

### B.

■ Although the bankruptcy court purported to apply the *Brunner* test of undue

---

4. Evidence of such abuse may be anecdotal; the National Bankruptcy Review Commission (NBRC) states that "empirical evidence does not support the oft-cited allegation that changes in bankruptcy law entitlements—exemptions, dischargeability, or otherwise—affect the rate of filing for bankruptcy to obtain those benefits." NATIONAL BANKR.REV. COMM'N, BANKRUPTCY: THE NEXT TWENTY YEARS § 1.4.5 (Oct. 20, 1997).

   The NBRC was an independent commission created to prepare a report on issues in the Bankruptcy Code for submission to the President, Congress, and the Chief Justice. *See* Bankruptcy Reform Act of 1994, Pub.L. No. 103–394, § 603, 108 Stat. 4106, 4147 (codified at 11 U.S.C. cmt. preceding § 101). The NBRC submitted its final report on October 20, 1997; having achieved its purpose, it ceased to exist.
   Notably, the NBRC recommended that § 523(a)(8) be repealed because "[t]he bankruptcy system, through its network of exceptions to discharge, seems to penalize individuals who seek to educate and improve themselves while it liberates other individuals from overwhelming debt incurred for other purposes or through different means." REPORT OF NAT'L BANKR REV COMM'N, *supra*, at § 1.4.5. The NBRC saw an added benefit in repeal of § 523(a)(8)(B) in that

"[l]itigation over 'undue hardship' would be eliminated, so that the discharge of student loans no longer would be denied to those who need it most." *Id.*

5. We have, however, expressed disapproval of a "policy" test examining "the failure to obtain or to benefit financially from the financed degree as a separate mitigating consideration in determining whether a student loan is dischargeable." *Rice*, 78 F.3d at 1150 n. 6.

6. The Third and Seventh Circuits have formally adopted the *Brunner* test. *See Pennsylvania Higher Educ. Assistance Agency v. Faish (In re Faish)*, 72 F.3d 298, 305–06 (3d Cir.1995), *cert. denied*, 518 U.S. 1009, 116 S.Ct. 2532, 135 L.Ed.2d 1055 (1996); *In re Roberson*, 999 F.2d 1132, 1135–37 (7th Cir.1993).

7. *Rice* dealt with the "significantly more stringent" unconscionability standard applied in discharge of Health Education Assistance Loans ("HEAL loans"); this standard places a heavier burden on debtors seeking discharge. *See Rice*, 78 F.3d at 1149; *see also* 42 U.S.C. § 292f(g). The factors noted in *Rice* are also relevant in evaluating discharge of ordinary student loans.

hardship, it did not engage in the meaningful inquiry required to evaluate either the Hornsbys' expenses or the extent to which their discretionary income could be applied to their student loans. Disregarding what appeared to be excessive expenses and income well in excess of the poverty guideline for a family of five, the bankruptcy court instead concluded that the Hornsbys' attorney had "understated" the estimated monthly expenses. The bankruptcy court also largely ignored the monthly budget surplus, noting that unexpected—and undocumented—expenses had prevented the Hornsbys from paying their bills four times over the preceding year. The bankruptcy court's analysis simply was not thorough enough to support a finding of undue hardship.

This is not to say that the Hornsbys are not financially burdened; moreover, they need not live in abject poverty before a discharge is forthcoming. *See Rice,* 78 F.3d at 1151 (finding that "the bankruptcy court must ascertain what amount is minimally necessary to ensure that the dependents' needs for care, including food, shelter, clothing, and medical treatment are met"). One bankruptcy court has recommended that "[w]here a family earns a modest income and the family budget, which shows no unnecessary or frivolous expenditures, is still unbalanced, a hardship exists from which a debtor may be discharged of his student loan obligations." *Correll v. Union Nat'l Bank of Pittsburgh (In re Correll),* 105 B.R. 302, 306 (Bankr.W.D.Pa.1989). While the Hornsby family income may be modest, the Hornsby family budget is not unbalanced. The Hornsbys operate with a surplus of approximately $200 per month, and their income puts them significantly above the poverty guideline for a family of five. *See Cheesman,* 25 F.3d at 359 (finding discharge where the debtors' "1992 gross income of $15,676 exceeded by only a slim margin the government's 1992 poverty income guideline of $13,-950 for a family of four"). The Hornsbys further do not seem to have minimized expenses in every way possible. *See, e.g., Ammirati v. Nellie Mae Inc. (In re Ammirati),* 187 B.R. 902, 907 (D.S.C.1995) (discharging student loans of a debtor who, although having income significantly above the poverty

guideline level, also had medical expenses and showed that he "had done everything possible to minimize expenses and maximize income"), *aff'd,* 85 F.3d 615 (4th Cir.1996). The bankruptcy court did not question what seem like an exorbitant bill for long distance telephone service or the Hornsbys' monthly bill of $100 for cigarettes.

In a rather conclusory fashion, the bankruptcy court also found that the Hornsbys had exhibited good faith efforts in managing their student loans, even though they failed to make a single payment. *See Healey v. Massachusetts Higher Educ. (In re Healey),* 161 B.R. 389, 397 (E.D.Mich.1993). The bankruptcy court further did not support the finding that any present inability to pay would persist for a significant portion of the repayment period. As the debtor in *Rice,* the Hornsbys are "young as well as healthy, and in all likelihood [their] income will increase in the future." *Rice,* 78 F.3d at 1150. The Hornsbys' financial circumstances and management of their debts do not meet any test of undue hardship such to justify discharge of their student loan obligations.

### C.

The motivation behind the bankruptcy court's decision to discharge the Hornsbys' student loans was apparently a belief that the Hornsbys were oppressed by their student loans and would be unable to make a "fresh start" without relief. *See Local Loan Co. v. Hunt,* 292 U.S. 234, 244, 54 S.Ct. 695, 78 L.Ed. 1230 (1934) ("Th[e] purpose of the [Bankruptcy Act] has been again and again emphasized by the courts as being of public as well as private interest, in that it gives to the honest but unfortunate debtor who surrenders for distribution the property which he owns *at the time of bankruptcy,* a new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of pre-existing debt."). Although the bankruptcy court should not have discharged the Hornsbys' entire student loans, we believe it had the power to take action short of total discharge. We find this

authority in 11 U.S.C. § 105(a),[8] which permits the bankruptcy court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title," so long as such action is consistent with the Bankruptcy Act. *See Securities and Exchange Comm'n v. United States Realty & Improvement Co.*, 310 U.S. 434, 455, 60 S.Ct. 1044, 84 L.Ed. 1293 (1940) ("A bankruptcy court is a court of equity and is guided by equitable doctrines and principles except in so far as they are inconsistent with the Act." (citations omitted)). In a student-loan discharge case where undue hardship does not exist, but where facts and circumstances require intervention in the financial burden on the debtor, an all-or-nothing treatment thwarts the purpose of the Bankruptcy Act.[9]

The scope of equitable power in student-loan discharge cases is as yet undefined. In *Cheesman*, however, we recognized the bankruptcy court's power to stay its order of discharge as an exercise of the equitable powers codified in § 105(a). *Cheesman*, 25 F.3d at 360–61 (affirming order staying discharge in order "to revisit the dischargeability issue in eighteen months"). In *Rice*, we found that a bankruptcy court had abused its equitable powers by discharging two-thirds of a debtor's student loans for the reason that such loans worked an "unconscionable hardship" upon the debtor's three young children. *Rice*, 78 F.3d at 1151. Yet we left unresolved the question of whether in other circumstances a bankruptcy court could discharge in part a nondischargeable student loan or grant other relief:

> As a final matter, we stress that we find it unnecessary in this case to decide whether a bankruptcy court may, consistent with the Bankruptcy Code and/or [42 U.S.C.]

§ 292f(g), exercise its equitable powers to grant a partial discharge of a HEAL debt, for, as we have concluded, nondischarge of the full amount of Rice's debt is not unconscionable. We also note that this case does not require us to decide whether a bankruptcy court may exercise its equitable powers to grant other forms of relief from such debts. In *Cheesman*, we have already authorized postponement of the discharge determination under appropriate circumstances.

*Id.* at 1151–52. In *Rice*, we also noted various equitable remedies devised by bankruptcy courts. *See id.* at 1152 n. 9.

Neither have other circuits resolved the scope of a bankruptcy court's equitable powers in a student-loan discharge case. The Third Circuit seems to have implicitly recognized—and explicitly rejected—a bankruptcy court's order partially discharging student loans where the bankruptcy court based its decision on equitable considerations. *See Faish*, 72 F.3d at 307 (finding no undue hardship and noting that "full nondischargeability is especially appropriate here because, in essence, [the debtor] was asking the bankruptcy court to allow a discharge of her student-loan obligation so that she could devote the money ... to savings for the purchase of a new car and to settle into a new apartment"). In another case ultimately finding no undue hardship, the Seventh Circuit affirmed an order deferring repayment of student loans, noting that the debtor could reopen bankruptcy proceedings if circumstances should later suggest undue hardship. *See Roberson*, 999 F.2d at 1138 ("If, upon the expiration of that deferment ... [the debtor's] financial condition has not improved as anticipated, he may file a motion requesting

---

**8.** The statute reads in full:

> The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

11 U.S.C. § 105(a).

**9.** *See* Thad Collins, Note, *Forging Middle Ground: Revision of Student Loan Debts in Bankruptcy as an Impetus to Amend 11 U.S.C. § 523(a)(8)*, 75 Iowa L.Rev. 733, 736 (1990) (describing bankruptcy courts' departure from the "all-or-nothing construction of section 523(a)(8)(B) in an attempt to soften the harsh results of this interpretation" and concluding that "[i]mplicit in this practice of revising student loan debts is the notion that a rigid, all-or-nothing interpretation does not sufficiently or effectively address the array of facts and circumstances that appear before the courts").

the bankruptcy court reopen his case ...."); *see also Rice*, 78 F.3d at 1152 n. 9.

Where a debtor's circumstances do not constitute undue hardship as to part of the debt but repayment of the entire debt would be an undue hardship, some bankruptcy courts have partially discharged student loans even while finding the student loans nondischargeable. *See, e.g., Griffin v. Eduserv (In re Griffin)*, 197 B.R. 144, 147 (Bankr.E.D.Okla.1996) ("[I]t would be an 'undue hardship' for the Debtors to pay any of the accrued interest and attorneys' fees associated with ... student loans."); *Bakkum v. Great Lakes Higher Educ. Corp. (In re Bakkum)*, 139 B.R. 680, 684 (Bankr.N.D.Ohio 1992) ("The Court, at its discretion, may excuse any portion of the Debtor's student loan obligation which would create an undue hardship."). Some bankruptcy courts have found that the statutory language of § 523(a)(8)(B) does not authorize partial discharge, however. *See, e.g., Skaggs v. Great Lakes Higher Educ. Corp. (In re Skaggs)*, 196 B.R. 865, 866–67 (Bankr.W.D.Okla. 1996).[10]

Student-loan creditors have, at least on one occasion, urged that dischargeability does "not have to be an 'all or nothing' choice and that an alternative remedy could be fashioned"; the bankruptcy court accordingly set a graduated repayment schedule balancing the debtor's impecunity with the creditors' rights to repayment. *Berthiaume v. Pennsylvania Higher Educ. Assistance Auth. (In re Berthiaume)*, 138 B.R. 516, 521 (Bankr. W.D.Ky.1992) (directing a debtor with non-dischargeable student loans to pay $65 per month with payments to increase to $100 on a specific date until the student loans were paid in full); *see also Heckathorn v. United States (In re Heckathorn)*, 199 B.R. 188, 196 (Bankr.N.D.Okla.1996) (finding nondischargeability but delaying execution of debts for five years, declaring that further interest should not accrue for three years, and prescribing a repayment schedule). Although a few bankruptcy courts have rejected the position that they can restructure student

loans, *see, e.g., Hawkins v. Buena Vista College (In re Hawkins)*, 187 B.R. 294, 301 (Bankr.N.D.Iowa 1995), one has effectively accomplished a partial discharge by treating each student loan separately and discharging those student loans that worked an undue hardship. *See Hinkle v. Wheaton College (In re Hinkle)*, 200 B.R. 690, 692 (Bankr. W.D.Wash.1996) ("While a bankruptcy court cannot restructure the loans, there is no reason that it cannot treat each one separately for the purpose of dischargeability, if the loans have not been consolidated by agreement of the parties.").

Where a debtor's circumstances do not constitute undue hardship, some bankruptcy courts have thus given a debtor the benefit of a "fresh start" by partially discharging loans, whether by discharging an arbitrary amount of the principal, interest accrued, or attorney's fees; by instituting a repayment schedule; by deferring the debtor's repayment of the student loans; or by simply acknowledging that a debtor may reopen bankruptcy proceedings to revisit the question of undue hardship. We conclude that, pursuant to its powers codified in § 105(a), the bankruptcy court here may fashion a remedy allowing the Hornsbys ultimately to satisfy their obligations to TSAC while at the same time providing them some of the benefits that bankruptcy brings in the form of relief from oppressive financial circumstances.

## IV.

For the reasons stated above, the decision of the district court affirming the order of the bankruptcy court is REVERSED. The case is REMANDED for proceedings consistent with this opinion.

---

**10.** *See* Collins, *supra* note 9, at 761 (describing "close-call" student-loan discharge cases as suitable for equitable remedies such as partial discharge or loan restructuring but warning that "the practice is arguably an intolerable form of judicial lawmaking").