**In re Frank AFFLITTO, Debtor.**

**Frank Afflitto, Plaintiff,**

v.

**United States of America, Defendant.**

**Bankruptcy No. 99–34401whb.
Adversary No. 00–0165.**

United States Bankruptcy Court,
W.D. Tennessee.

Dec. 18, 2001.

Phillip R. Walker, Austin & Walker, PLLC, Cordova, Tennessee, for plaintiff.

Monica M. Simmons, U.S. Attorney's Office, Memphis, Tennessee, for United States of America.

## MEMORANDUM OPINION ON DEBTOR'S COMPLAINT TO DETERMINE DISCHARGEABILITY OF STUDENT LOAN DEBT

WILLIAM H. BROWN, Bankruptcy Judge.

### OPINION

This adversary proceeding is before the Court on the Plaintiff–Debtor's ("Debtor") complaint to determine the dischargeability of his consolidated and federally-guaranteed student loan. The Debtor alleges that his student loan is dischargeable in his chapter 7 bankruptcy case because repayment of the loan under the circumstances existing would impose an undue hardship on the Debtor as contemplated under 11 U.S.C. § 523(a)(8). The Defendant, the United States of America Department of Education ("DOE"), contends that, under the Debtor's circumstances, repayment of the loan would not constitute the undue hardship necessary to warrant discharge of the debt.

At the conclusion of the trial on May 22, 2001, the Court took the dispute under submission, and subsequently, an order was entered holding this opinion in abeyance pending a decision by the Bankruptcy Appellate Panel for this Circuit in a case raising student loan issues.[1] Based on the trial testimony of the Debtor and Danielle Smith, program analyst for DOE, the stipulations, statements and arguments of counsel, and the entire record in this proceeding, the Court now determines that repayment of the Debtor's entire student loan, with its accruing interest, will impose an undue hardship and that significant adjustment to the amount of the principal and interest related to this debt is equitable under the circumstances existing in this proceeding. However, due to the Debtor's change in employment subsequent to the trial of this proceeding, the Court will grant a temporary deferment of payments while withholding a final decision, giving an opportunity for a further hearing after the completion of one year of the Debtor's current employment.

This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(1) and 157(b)(2)(I). The following constitutes the Court's findings of fact and conclusions of law pursuant to FED.R.BANKR.P. 7052.

### ISSUE

The primary issue before the Court is whether, under the particular facts and circumstances existing in this case, repayment in full of the Debtor's student loan

---

1. A limited precedential decision has now been entered by the Bankruptcy Appellate Panel in *DeMatteis v. Pennsylvania Higher Educ. Assistance Agency (In re DeMatteis)*, No. 01–8022 (6th Cir. BAP Nov. 30, 2001), and this trial judgement as a member of the *DeMatteis* Panel. Although the BAP's decision lacks precedential effect in this proceeding, its reasoning as to the proper application of 11 U.S.C. § 105(a) in conjunction with § 523(a)(8) is persuasive authority for this Court. That reasoning will be discussed later in this opinion.

debt will impose an undue hardship on the Debtor and his dependents as contemplated under § 523(a)(8), thus rendering the debt dischargeable in the Debtor's chapter 7 bankruptcy case.

## FACTUAL SUMMARY

The facts of this case are undisputed, with many stipulations entered into by the parties. The case illustrates the high cost of higher education when it is pursued from undergraduate to the highest level of postgraduate degree. The Debtor first incurred student loans to finance his undergraduate education in 1983. After earning a bachelor's degree in 1988, the Debtor enrolled in a graduate program and earned a Master's Degree in Criminology, Law and Society in 1993. He was ultimately awarded a Ph.D. in Social Ecology on September 16, 1998. Over the course of his academic career the Debtor incurred student loan debts totaling $127,514.30. During the period from 1983 to 1998 the Debtor requested and received numerous loan-payment deferments and forbearances. The Debtor consolidated his loans through the United States Department of Education and executed a Federal Direct Consolidation Loan Promissory Note on September 8, 1998. The total amount of this loan was $95,363.88, with a variable interest rate that was at the time of trial 8.19%. The Debtor has paid only minimal amounts since the consolidation, and the DOE's representative testified that the total principal amount owed by the Debtor was $96,651.36. Added to the principal amount is accruing interest, for a total outstanding balance on the trial date of $116,230.94.

The Debtor is currently under the DOE's Income Contingency Repayment Plan ("Plan") so that his monthly payments are adjusted according to his income. At trial time, the Debtor's scheduled payments had been reduced from $809 to $450.37 per month. Under the terms of this Plan, after 25 years of repayment the remaining unpaid debt would be forgiven, although the borrower may then incur income tax liability for any amount forgiven. In contrast, 11 U.S.C. § 346(j)(1) would eliminate tax liability for the discharged amount of debt. Although the DOE puts a limit on capitalization under this Plan, interest continues to accrue at an adjustable rate. Under the currently scheduled monthly payments, the DOE's representative, Danielle Smith, testified that the Debtor would not repay even the accruing 8.19% interest. Ms. Smith testified that, based on the Debtor's current income, the Income Contingency Repayment Plan with its present $450.37 monthly payment is the best plan for which the Debtor qualifies under the Department's income guidelines. The $450.37 amounts to an interest payment, with no payment toward principal. Thus, absent a significant change in circumstances, after 25 years of currently scheduled payments, the Debtor would still owe the entire principal.

The Debtor commenced his chapter 7 bankruptcy case on November 19, 1999, then making his first student loan payment on the loan at issue on December 28, 1999 in the amount of $250. The Debtor made his second and last payment of $75 on January 3, 2000. Both of these payments were made in conjunction with the Debtor's request for further forbearance of loan repayment.

The Debtor was employed at the time of trial as an assistant professor in the Criminology and Criminal Justice Department at the University of Memphis, earning a gross annual salary of $41,172, with net earnings of $2,533 per month. In addition to his monthly salary, the Debtor periodically has earned income from independent consulting and, when available, has taught

summer classes. The Debtor testified at trial that he had accepted a teaching position at Arizona State University in an attempt to increase his employment opportunities and to better utilize his skills and experience. In particular, his Spanish fluency would be more beneficial in Arizona than Memphis, and he expressed a belief that Arizona State was not as economically depressed as the University of Memphis. He expected to earn a gross salary of $48,000 in his new position, but he would not be permitted to teach summer classes in Arizona for the first five years of employment.

The Debtor is divorced[2] and has full custody of his two minor children of that marriage, ages 7 and 5 years. He receives no child support payments from his ex-wife. The Debtor's 7 year-old suffers from post-traumatic stress syndrome and is undergoing treatment from a psychiatrist. At the time of trial, the Debtor paid $95 per week for after-school day care, and $195 per week per child for summer camp. An additional $35 to $55 per week per child was expended during the summer months for summer camp field trips. In addition to his obligations as custodial parent, the Debtor voluntarily pays child support in the amount of $200 to $250 per month for a third minor child living in Colorado.

The Debtor is not obligated to pay alimony to his ex-wife, although as a result of the divorce he owes $700 to $800 for a court interpreter plus court costs and is obligated to pay 50% of his ex-wife's auto insurance. In addition, pursuant to the marital property division, the Debtor's ex-wife was awarded 50% of the Debtor's TIAA–CREF retirement fund, which had

$13,000 in value at trial time, and 100% of his modest 401K investment, which totaled $1,000. As a part of his effort to minimize expenses, the Debtor had eliminated the $20 monthly deduction to the 401K plan.

The Debtor owed approximately 24 more payments on his car, a 1995 Nissan Altima with 98,000 miles, but it can be expected that he would need to purchase a replacement car by the time that one is paid off. He expected to pay in full an additional small student loan, with a $1,100 balance, at $30 a month in two to three years.

The parties have stipulated that, since the Debtor filed his bankruptcy schedules, he had the following monthly expenses:

| | |
|---|---|
| Rent | $ 615.00 |
| Daycare | $ 400.00 |
| Cell Phone | $ 90.00 |
| Utilities | $ 110.00 |
| Telephone | $ 20.00 |
| Bell South Mobility | $ 66.00 |
| Cable[3] | $ 34.13 |
| Food | $ 500.00 |
| Clothing | $ 45.00 |
| Laundry and Dry Cleaning | $ 30.00 |
| Medical and Dental Expenses | $ 50.00 |
| Transportation/Gas | $ 120.00 |
| Recreations, clubs, entertainment, newspaper, magazines, etc. | $ 17.50 |
| Charitable contributions | $ 35.00 |
| Car and Renter's Insurance | $ 84.00 |
| Auto | $ 283.00 |
| MATCU [cosigned] loan | $ 107.14 |
| Heilig–Meyers | $ 65.00 |
| Payments for support of additional dependents not living in your home | $ 200.00 |
| Therapy | $ 45.00 |
| Postage | $ 30.00 |
| Bankruptcy Attorney | $ 65.00 |
| Divorce Attorney | $ 65.00 |
| Haircuts | $ 24.00 |
| Savings | $ 25.00 |
| **Total** | **$3,125.77** |

**2.** Although the Debtor's divorce trial was heard in state court on January 16, 2001, no final decree had been entered by the state court judge.

**3.** The Debtor testified that his cable television service is the only entertainment expense that he regularly budgets for the children.

The budgeted expenses exceeded the Debtor's take-home salary. No questions were raised by DOE concerning the reasonableness of these budgeted expenses. In fact, except for an increase in rent and the cellular phone charges, the government conceded that it "does not contend that the Debtor/Plaintiff's living expenses ... are excessive, unreasonable or have not been minimized." Interrogatory response 11, docket entry 39. The Debtor testified that he has attempted to minimize his monthly expenses by terminating his supplemental life insurance, foregoing his "premium" parking space at work, and stopping payments into his 401K retirement investment. At trial time, the Debtor had no cash in the bank and owned no real property and no personal property valued at more than $500. He expected his living expenses to increase when he moved his family to Arizona; for example, a two-bedroom apartment would cost $850 in Tempe compared to his rent of $615 in Memphis. The government's interrogatory response notwithstanding, there was no proof that this rent increase was unnecessary or unreasonable. The Debtor testified that if he is forced to pay even $75 per month on his federal student loan debt, he will be unable to pay his set monthly expenses.

As to the debts budgeted for continued payment, the Debtor testified that he was paying MATCU, a teachers' credit union, because it was cosigned by a colleague and it was expected to be fully paid in June, 2001. Helig–Meyers is a furniture-acquisition loan, and there was no proof about its pay-off date. Although the budget contains two attorney-fee items that are short term in character, the fees owed are significant, to his divorce attorney $1,300, at $65 per month, and to the bankruptcy attorney $5,000, at $65 per month. In addition to the budgeted items, the Debtor is attempting to repay his parents $1,300 at $45 per month for their financial help with his divorce and his thesis adviser for a personal loan of $900 at $110 per month.

Fortunately, the Debtor is in good health, with medical insurance benefits provided through his employer.

Significantly, the parties entered a stipulation that "the Plaintiff, Frank Afflitto, has made a meaningful job search and is employed in a position commensurate with his education and training." Stipulation of the Parties filed May 21, 2001, docket entry 55. Moreover, the government's interrogatory response denied any contention "that Debtor/Plaintiff's future income, earnings or earning capacity will increase significantly." Response number 12, docket entry 39. Thus, there is no issue about whether the Debtor has made his best effort to obtain optimal employment commensurate with his advanced degree.

## DISCUSSION

Section 523(a)(8) of the Bankruptcy Code governs the dischargeability of student loan debt and provides as follows:

(a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—

(8) for an educational benefit overpayment or loan made, insured or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution, or for an obligation to repay funds received as an educational benefit, scholarship or stipend, unless excepting such debt from discharge under this paragraph will impose an undue hardship on the debtor and the debtor's dependents.

11 U.S.C. § 523(a)(8). The Debtor alleges that, under his financial circumstances, repayment of his student loan will amount to the undue hardship required to except his

student loan debt from the general rule of nondischargeability. Congress did not define undue hardship in the Bankruptcy Code; thus courts have adopted various criteria. However, "[c]ourts universally require more than temporary financial adversity and typically stop short of utter hopelessness." *Tennessee Student Assistance Corp. v. Hornsby (In re Hornsby)*, 144 F.3d 433, 437 (6th Cir.1998) (citing Slavin, *Student Loans, Bankruptcy, and the Fresh Start Policy: Must Debtors Be Impoverished To Discharge Educational Loans?*, 71 TUL.L.REV. 139, 149–53 (1996)).

The legislative history of § 523(a)(8) and the policies underpinning the student loan exception to discharge suggest that Congress wanted to prevent abuse by recent graduates:

> Congress excepted student loans from discharge in order to close what it deemed a loophole in the student loan program. This so-called loophole permitted graduates to escape their student loan obligations by filing bankruptcy on the eve of a lucrative career. The exception to discharge was created to "rescu[e] the student loan program from insolvency, and [to] prevent[ ] abuse of the bankruptcy process by undeserving student debtors."

*Andresen v. Nebraska Student Loan Program, Inc. (In re Andresen)*, 232 B.R. 127, 130 (8th Cir. BAP 1999) (citations omitted). The Sixth Circuit has commented:

> The legislative history of the 11 U.S.C. § 523(a)(8) teaches us that the exclusion of educational loans from the discharge provisions was designed to remedy an abuse by students who, immediately upon graduation, filed petition for bankruptcy and obtained a discharge of their educational loans. This was due to the fact that unlike commercial transactions where credit is extended based on the debtor's collateral, income, and

credit rating, student loans are generally unsecured and based solely upon the belief that the student-debtor will have sufficient income to service the debt following graduation.

*Andrews Univ. v. Merchant (In re Merchant)*, 958 F.2d 738, 740 (6th Cir.1992) (citing H.R.REP. No. 95–595, at 466–75 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5865).

■ Rather than adopt a specific test to measure undue hardship, the Sixth Circuit has looked approvingly at several factors. *See In re Hornsby*, 144 F.3d at 437 (citing *Cheesman v. Tennessee Student Assistance Corp. (In re Cheesman)*, 25 F.3d 356, 359 (6th Cir.1994) and *Rice v. United States (In re Rice)*, 78 F.3d 1144, 1149 (6th Cir.1996)). The *Hornsby* Court set forth some nonexclusive factors to be considered by the bankruptcy court:

> We have considered the three factors set forth in *Brunner v. New York State Higher Educ. Serv. Corp.*, 831 F.2d 395 (2d Cir.1987) (per curiam), which is the test that has been most widely applied:
>
> > One test requires the debtor to demonstrate "(1) that the debtor cannot maintain, based on current income and expenses, a 'minimal' standard of living for herself and her dependents if forced to repay the loans; (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period . . .; and (3) that the debtor has made good faith efforts to repay the loans."

A bankruptcy court might also consider, among other things, "the amount of the debt . . . as well as the rate at which interest is accruing" and "the debtor's claimed expenses and current standard of living, with a view toward ascertaining whether the debtor has attempted to

minimize the expenses of himself and his dependents."

*In re Hornsby*, 144 F.3d at 437 (footnotes and citations omitted). The debtor carries the burden of proof of undue hardship, measured by a preponderance of the evidence standard. *Butler v. Tennessee Student Assistance Corp. (In re Butler)*, No. 95–28281–WHB, Adv. No. 96–0393, 1997 WL 35195 at *1 (Bankr.W.D.Tenn. Jan.24, 1997).

■ Utilizing a variation of the *Brunner* test, which the Bankruptcy Appellate Panel of this Circuit has adopted as an appropriate test in *Dolph v. Pennsylvania Higher Educ. Assistance Agency (In re Dolph)*, 215 B.R. 832, 836 (6th Cir. BAP 1998), and regarding its first factor, this Court is persuaded that the Debtor and his dependents have a very modest standard of living. One may question what is "minimal" under the *Brunner* standard, but this Court finds "minimal" to be a flexible and subjective term that can only have objective meaning in light of the particular facts of each case. Although the *Brunner* court used the term "minimal," this Court does not read the Bankruptcy Code to require debtors to live "at or below poverty level to be entitled to a fresh start." Frattini, *The Dischargeability of Student Loans: An Undue Burden?*, 17 Bankr.Dev.J. 537, 573 (2001). As the author of that note suggests, the court should be examining "the overall living situation of the debtor," in an effort to "ensure the debtor is not living an extravagant life, incurring unnecessary and frivolous expenses, and sitting on comfortable income or assets." *Id.* More specifically, the court should be engaged in a determination of whether the debtor can afford, with reasonable efforts, to repay all or part of the student loan, while adequately supporting the debtor and any dependents. This is, like so much else in bankruptcy, a totality-of-the-circumstances examination. *See id.* at 572. This Court is not persuaded that the *Brunner* test is in reality anything more than another expression of a totality-of-the-circumstances examination.

Photographs of the Debtor's apartment in Memphis demonstrate minimal furnishing, and there was no evidence of any extravagance in this family. Notwithstanding a significant annual income, the Debtor's monthly budget can not be trimmed much further, while maintaining a "minimal" standard of living for himself and his three dependent children. As the defendant concedes by stipulation, the Debtor has maximized his employment opportunity, and no effort was made to show that the Debtor could further minimize his expenses.

■ The only room for reduction of monthly expenses at the time of this trial were for elimination of the de minimus charitable contribution, and the repayment of his short-term debts: for a car, another student loan, Helig–Meyers and MATCU debts, attorney's fees, and debts to his parents and to his colleague. Elimination of these will, however, be offset to some degree by the increase in rent in Arizona (an increase of $235), as well as by the normal increases in costs of living, such as rent and utilities, and by the replacement of his older and only vehicle. This Court should not assume that the Debtor will never need to incur new debts at any time within his working future. Under the best of circumstances, it is difficult to imagine how the Debtor's currently expected income level would support a finding of anything but a long-term modest standard of living for himself and his minor dependents. And that is without any scheduled repayment of the disputed student loan debt. It is only when the children in his custody no longer need day care that any significant cash flow may be realized, but

no proof was offered as to when that time would arrive, nor was there proof about whether the expense would be eliminated completely or would merely reduce periodically. Again, that reduction of the current $400 day care expense would be expected to be offset by other normal child care expenses as the children become older.

The only proof at trial supports a finding that the Debtor's financial circumstances are not likely to change, at least significantly, in the near future. He is the custodial parent of two young children who will be under his care for approximately 11 to 13 years, assuming his support obligation ended at their 18th year, and the Debtor also helps to financially support his young son in Colorado. As he conceded, should the custodial parent of that child seek a judicial enforcement of support, under current child-support guidelines in Colorado, the Debtor's income would dictate significantly more than $200 per month. One of the children in his custody needs regular medical care.

 In addition to an expectation of long-term child-care expenses, there is no proof that the Debtor can significantly increase his current earnings. The parties have stipulated that the Debtor is currently employed in a position commensurate with his abilities and educational experience. This addresses the second prong set forth under the *Brunner* criteria at the time of this trial. In reality, this test is one of whether a debtor has the "potential ability to repay the loan" or a significant portion of it. *Id.* at 573. Notwithstanding an expected increase in annual base income for the academic year in Arizona, the Debtor has only a hope that his overall annual income will increase, since he has lost the opportunity to teach in the summers for five years. It would appear that he must find and capitalize upon nonteaching, extra income if he has a meaningful chance of significantly improving his income in both the near and distant future.

Notwithstanding the present evidence supporting a finding that the Debtor's financial status is unlikely to significantly improve in the foreseeable future, the Court believes that an opportunity for a further hearing, after a full year of Arizona employment, will benefit the Court in its final determination that the Debtor's financial situation is or is not likely to remain substantially the same as at the time of trial. The Court will, therefore, reserve a final determination at this time as to this second factor.

 As to the issue of the Debtor's good faith efforts concerning this student loan, again the Court modifies to some extent the *Brunner* language. It is not so much whether a debtor has made a good faith effort to repay as it is a question of overall good faith in regard to the student loan. Notwithstanding the minimal payments on this student loan, the Court finds that the Debtor has made good faith efforts as to this debt. This Court agrees that "seeking forbearance agreements" is not in itself an indicia of good faith. *Goulet v. Educ. Credit Mgmt. Corp. (In re Goulet)*, 264 B.R. 527, 531 (W.D.Wis.2001). However, the fact that a debtor has only been able to obtain such agreements or otherwise defer payments is not in itself grounds to find an absence of good faith. "Good faith is measured by the debtor's efforts to obtain employment, maximize income and minimize expenses." *Id.* In other words, a totality-of-circumstances examination again drives the good-faith analysis. The amount and number of repayments cannot alone determine whether a good-faith repayment effort has been made. After all, if a debtor is financially unable to repay any part of a student loan, it can not be said that a good-faith

effort is lacking. Impossibility is surely a component of the good-faith analysis.

Although the Debtor applied for and received many payment deferrals over the course of the original repayment periods, the Debtor received loan proceeds from 1983 through 1998, over the course of a 15–year period. During this time, the Debtor did not evade financial responsibility; rather, he worked in minimum-wage and other jobs while pursuing his degrees in order to support his family. While his two payments are certainly minimal, the defendant DOE granted the Debtor's deferral requests, indicating that good cause existed for those requests. As the Department's representative testified, the Debtor was at the time of trial not in default under his current repayment plan. It is significant that the Department conceded that the Debtor, at his presently scheduled payments, would not touch repayment of the principal and would not repay in full the accruing interest. It would appear that the Department has cooperated as fully as its regulations would permit with the Debtor's requests, granting him the best plan available for someone earning his annual income. In light of the circumstances of this particular case, the Court finds that a good-faith effort has been made by the Debtor in regard to his student-loan obligations.

■ The amount of the debt and the accruing interest rate are also appropriate factors for the Court to consider in its good-faith analysis. *See Hornsby,* 144 F.3d at 437. In this case, the Debtor has incurred a substantial debt over the course of his lengthy academic career—a principal balance of $96,651.36 and with interest added, a total debt of more than $106,754. This is a significant financial burden, and one that is insurmountable considering the Debtor's age of 41 and the fact that the Defendant concedes that, with currently

scheduled payments, the Debtor could not repay even accruing interest within the allowed repayment period, at the end of which the Defendant would forgive the remaining balance. Given this admission by the Defendant, a determination of non-dischargeability would subject the Debtor and his dependents to 25 years of payments that would not even compensate the government for its accruing interest.

■ The *Hornsby* opinion also suggests that in performing its good-faith analysis, it is appropriate for the court to review the Debtor's claimed monthly expenses and standard of living, to determine if it appears that the Debtor has attempted to minimize his expenses while maintaining only a modest lifestyle. 144 F.3d at 437. As stated previously, the Court finds that this Debtor has made a good-faith effort to minimize his monthly expenses for himself and his minor children and that his family is living under a very modest standard.

■ The Court concludes that this Debtor has shown by a preponderance of the evidence that circumstances constituting undue hardship exist in this case if the Debtor were required to repay all of this student loan debt and its accruing interest. Moreover, the Court is given authority through its equitable powers under § 105(a) to fashion a remedy to provide the Debtor the benefit of a "fresh start" while at the same time granting some satisfaction of the student loan debt. The Bankruptcy Appellate Panel for the Sixth Circuit has recently expressed an appropriate overlay of § 105 on § 523(a)(8):

Section 105(a) may appropriately be used when the trial court finds that some remedy is appropriate but that full discharge is not called for, an interpretation that allows an overlay of § 105(a) on § 523(a)(8) rather than an independent application of § 105(a). In other words,

a debtor may be unsuccessful in proving sufficient undue hardship for a total discharge but still demonstrate sufficient undue hardship to justify some equitable remedy.

*DeMatteis v. Pennsylvania Higher Educ. Assistance Agency (In re DeMatteis)*, No. 01–8022, slip op. at n. 2 (6th Cir. BAP Nov. 30, 2001). "The partial dischargeability or other modification of a student loan debt, to the extent its payment is an undue hardship, but no further, accomplishes both Congressional purposes of providing debtors with a 'fresh start' while maximizing student loan repayment." *Heckathorn v. United States Dept. of Educ. (In re Heckathorn)*, 199 B.R. 188, 195 (Bankr. N.D.Okla.1996). Applying the bankruptcy court's equity power in conjunction with § 523(a)(8), rather than as a separate tool when no undue hardship is found, also avoids a conflict with the Supreme Court's determination that the bankruptcy court's equity power "can only be exercised within the confines of the Bankruptcy Code." *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 206, 108 S.Ct. 963, 969, 99 L.Ed.2d 169 (1988).

The Court concludes that the equities weigh in favor of a partial discharge of the Debtor's student loans under the facts and circumstances existing in this case. If the Debtor devoted all of his current and reasonably anticipated disposable income to repayment of his student loans, he still could not repay the loans in full during his lifetime under the best repayment plan proposed by DOE. In addition, the facts of this case do not indicate that this Debtor is the type of debtor that Congress intended to deter by excepting student loan debts from discharge. The parties have stipulated that the Debtor is presently employed to the extent of his skill and educational experience. He does not appear to have filed for bankruptcy protection "on the eve of a lucrative career;" rather, his timing of the bankruptcy was triggered by his divorce and its costs, as well as by the impossibility of his financial obligation on this student loan. In addition, as the Court has noted above, the Debtor's financial circumstances are not likely to improve at any time in the near future. Although his new position at Arizona State University is a higher paying position, the Debtor expects that his living expenses will increase when he relocates to that area.

In balancing the equities, the Court recognizes that the Debtor certainly has obtained a financial benefit from the education he received. The student loans enabled the Debtor to earn first a bachelor's degree, then a master's degree, and ultimately a Ph.D. As a result of his education, the Debtor is now a college professor earning a significant, albeit insufficient, income. Notwithstanding his advance degree, the Debtor still lacks the financial ability to repay all of his student loan obligation.

## CONCLUSION

Based upon the foregoing analysis, the Court finds that an appropriate equitable remedy includes the complete discharge of the accrued and accruing interest on the Debtor's consolidated student loan, and the abatement of repayment on any principal for a period of one year from entry of this opinion. This abatement will give the Debtor an opportunity to repay some of his short-term debt, while assessing the financial impact of his move to Arizona and employment there. During the one year following entry of this opinion, the Debtor shall provide such information about his income, expenses and future earning abilities as the Defendant may reasonably request. At the end of one year from entry of this opinion and its related order, the attorney for the Defen-

dant Department of Education may request a further hearing by motion, at which time a further hearing will be held to determine whether the Debtor's long-term financial circumstances have changed so as to permit more than the following monthly payments on the loan's principal balance.

In the absence of the Department's motion for a further hearing in one year, the Court's determination, based upon the circumstances existing at the time of the trial, is that it would be an undue hardship for the Debtor to repay more than $250 per month for a period of 20 years, with payments to begin in the 13th month after entry of this opinion and its related order. Such a repayment schedule would permit repayment of $60,000, approximately 60% of the principal debt, and would terminate repayment at about the time the Debtor would normally be expected to retire. Any principal remaining, as well as all interest, would be discharged under the undue hardship standard.

In addition to the defendant's opportunity to move for further hearing in one year, the Debtor may move, at the end of one year following entry of this opinion, for further hearing should his long-term financial circumstances either deteriorate or improve so as to justify a modification of the $250 monthly repayment or the 20–year repayment schedule.

Should neither party timely move for further rehearing, the partial discharge and repayment schedule shall become a final determination and judgment. Pending the filing of a motion for rehearing, the Clerk may close this proceeding but shall reopen it without costs upon the filing of a motion for rehearing. Because this partial discharge and repayment schedule will not become final for one year, should either party wish to appeal at this time, a motion for leave to appeal may be required. See

FED.R.BANKR.P. 8001(b), 8003; 28 U.S.C. § 158(a)(3).